UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

JANICE VAN DYNE,

                                  Plaintiff,

           v.

ANDREW M. SAUL, *Commissioner of Social Security Administration*,

                            Defendant.

                       **MEMORANDUM & ORDER**
                       20-CV-260 (MKB)

--------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

       Plaintiff Janice Van Dyne commenced the above-captioned action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Social Security disability insurance benefits ("DIB") under the Social Security Act (the "SSA").  (Compl., Docket Entry No. 1.) Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure arguing that the findings of Administrative Law Judge Andrew Weiss (the "ALJ") were not supported by substantial evidence — namely, his findings that Plaintiff retained the physical capacity to perform light work and that she has past relevant work as a housekeeper that she remains capable of performing.  (Pl.'s Mot. for J. on the Pleadings, Docket Entry No. 9; Pl.'s Mem. in Supp. of Pl.'s Mot. 18–23 ("Pl.'s Mem."), Docket Entry No. 10.)  The Commissioner cross-moves for judgment on the pleadings arguing that substantial evidence supported the ALJ's findings.  (Comm'r Mot. for J. on the Pleadings, Docket Entry No. 12; Comm'r Mem. in Supp. of Comm'r Mot. ("Comm'r Mem."), Docket Entry No. 12-1.)

For the reasons set forth below, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion for judgment on the pleadings.

## I. Background

Plaintiff was born in 1961, (Certified Admin. R. ("R.") 41, 129, Docket Entry No. 7), earned a high school equivalency diploma in 1986 and completed two years of college, (R. 197, 357), and was employed part-time as a housekeeper in a private country club from January of 1998 until sometime between 2001 and 2004,[1] (R. 41–44, 187, 197).

Plaintiff applied for DIB on January 24, 2014,[2] alleging that she suffers from fibromyalgia and injuries to her neck and back that have limited her ability to work as early as September 24, 2003.[3] (R. 25, 129, 178, 196.)  The Social Security Administration denied her claim on April 10, 2014, (R. 140–43), and Plaintiff requested a hearing with an administrative law judge, (R. 145–47).  A hearing was held on December 1, 2014, before the ALJ.  (R. 38–67.) By decision dated January 8, 2016, the ALJ determined that Plaintiff is not disabled.  (R. 22–37.) On September 20, 2019, the Social Security Administration Appeals Council denied Plaintiff's request for review of the ALJ's determination, rendering his decision final.  (R. 9–15.)  Plaintiff timely appealed to the Court.  (*See* Compl.)

---

[1]  As discussed below, it is unclear from the record when Plaintiff ceased working.

[2]  The administrative record also contains a document representing that Plaintiff completed an application for DIB on January 15, 2014.  (R. 129.)

[3]  Plaintiff also claimed that she suffered from depression, anxiety, and attention deficit disorder.  (R. 27, 196.)  The ALJ found that "these medically determinable impairments do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and [are] therefore nonsevere."  (R. 28.)  As the Commissioner notes, Plaintiff raises no issues regarding these determinations.  (Comm'r Mem. 2 n.4.  *See generally* Pl.'s Mem.)  Accordingly, the Court limits its discussion to the ALJ's determinations on Plaintiff's physical disability claims.

### a.   Hearing before the ALJ

On December 1, 2014, Plaintiff appeared at the hearing with counsel.  (R. 38–67.)  The

ALJ heard testimony from Plaintiff and vocational expert Dawn Blythe (the "VE").  (R. 38–67.)

### i.   Plaintiff's testimony

Plaintiff testified that she worked "on the books" as a housekeeper "until around 2000,

maybe in 2002 or 2003."  (R. 41.)  The ALJ asked Plaintiff, "And when did you work off the

books?"  (R. 42.)  Plaintiff responded, "I worked in a private country club as a housekeeper and I

got shuffled off by the women to do their houses . . . [a]round 2003, 2004."  (R. 42.)  The ALJ

asked Plaintiff again when she had last worked, and Plaintiff guessed that she had last worked

"[o]n the books" in 2003.  (R. 42.)  The ALJ asked Plaintiff if she had worked "off the books"

since 2003 and Plaintiff stated, "Oh. Well, I feel that every day I work.  I mean, I haven't earned

money."  (R. 42.)  Plaintiff explained that she is collecting temporary assistance from the

Department of Social Services, and that although she does not have a job, taking care of herself

and her house and going to the doctor is work.[4]  (R. 42–43.)  Specifically, Plaintiff testified that

household chores, including vacuuming, dusting, cleaning her refrigerator, taking out garbage,

---

[4]  The dates of Plaintiff's employment are unclear from the record.  Plaintiff's certified
earnings records show no reported earnings after 2001, in which year she reported earning
$5,341.71.  (R. 187.)  However, Plaintiff reported in the "job history" section of a disability
report dated January 24, 2014, that she "had only one job in the last [fifteen] years before [she]
became unable to work" and that she worked at this job until September of 2002.  (R. 197.)
Plaintiff's testimony is also unclear, and the parties interpret it differently.  (*Compare* Pl.'s Mem.
22 (stating that Plaintiff "testified that she worked off the books in 2002 and 2003 (citing R. 41–
42)), *with* Comm'r Mem. 14 ("[Plaintiff] admitted that she continued off-the-books work in 2003
and 2004 . . . ." (citing R. 42, 44, 187)).)  Based on the ambiguity of the word "work," it appears
that Plaintiff and the ALJ did not clearly understand each other.  (*See* R. 42–43 (Plaintiff stating
"I feel that every day I work" and that "[t]aking care of myself," "[t]aking care of my house,"
"[g]oing to the doctors," and "taking care of my dog" is work); R. 196 (Plaintiff stating, in "work
activity" section of January 24, 2014 disability report, that she "stopped working" on December
30, 2011, though she reported on the same form that she stopped working at her only job in
September of 2002).)

and doing laundry, are painful, and that she is not able to do them daily.  (R. 43–44, 52.)  In addition, she testified that it takes her two or three days to physically recover from doing chores when those chores take "an entire day."  (R. 52.)

Plaintiff stopped working as a housekeeper in 2003 because it became "debilitating" and she started "having pain" in her lower back.  (R. 44.)  Plaintiff explained that she had worked since the housekeeping job but that her back pain was "progressive."  (R. 44.)  Plaintiff also explained that she had gone to school for photography and had some prior work experience in that field, and that she had "put[] forth the effort" to "go back into [photography]" by enrolling in a photography course at Suffolk County Community College in 2014.  (R. 44–45.)  However, Plaintiff's professor advised her not to take any more classes "until you get some computer skills" because Plaintiff was "deficient in technology."  (R. 45.)  Although photography is her passion, she is not looking for jobs in photography because her "[photography] days are over."  (R. 46.)

Plaintiff lives in chronic pain every day, which "sucks the energy out of [her] life."  (R. 47.)  Although she can take her dog out for short walks in warmer weather, she cannot play with her vigorously.  (R. 47.)  Plaintiff has limited use of her right thumb.  (R. 48.)  Plaintiff recounted a recent "episode" where her body "went into shock" and she experienced muscle spasms in her back after going outside in seventeen-degree weather.  (R. 49, 58.)  She "thought [that she] was going to the emergency room" but decided instead to "put the TENS unit on" and "lived on a heating pad."  (R. 58.)  She remained in bed for three days because her medication no longer "work[s] as well" and because she did not want to "get[] in the car and driv[e]" to receive "shots" for the pain.  (R. 49; *see also* R. 479–84.)  Plaintiff's muscle spasms can be so intense that she "wind[s] up in the emergency room" or mild enough that she only needs to "lie down."

(R. 58.)  When asked how often the spasms occur, she testified that "[e]very day is different" and that "[i]t's unpredictable."  (R. 58–59.)  Plaintiff does not have problems grasping objects or turning a doorknob but sometimes drops small objects like spoons when manipulating them with both hands.  (R. 53.)

The ALJ observed that Plaintiff was "sitting comfortably" during her testimony.  Plaintiff stated that this was possible because she was "medicated" but added that she would need to "recover from it" after the medication "wear[s] off."  (R. 52–53.)  Without medication, Plaintiff can sit for five to ten minutes at a time.  (R. 55.)  Plaintiff can walk "sometimes" and shops for groceries three or four times a week but must carry items like milk and orange juice — "all those jugs" — piecemeal.  (R. 54–55.)  When the ALJ asked her whether a jug "could weigh [ten] to [fifteen] pounds," Plaintiff said, "I don't know."  (R. 56.)  Plaintiff buys half-gallon beverages because the one-gallon jugs are too heavy for her.  (R. 56.)

Plaintiff experiences constant neck pain — even with medication and lidocaine patches — which she says is "always about at least a five" on a scale from one to ten, one being no pain and ten being the worst pain imaginable.  (R. 55–56.)  Plaintiff stated that the pain she constantly experiences is four to six times the pain of a shot from a twenty-five-gauge needle.  (R. 56.)  Plaintiff has range-of-motion problems with her neck when she turns her head to the left or right and it "doesn't feel good" to look upward.  (R. 56.)  In addition, bending down from a standing position to pick up an object like a quarter from the ground is difficult and painful.  (R. 57.)

Plaintiff could not go back to performing her previous job as a housekeeper "[b]ecause I can't even clean my own house."  (R. 59.)  In addition, it takes her four to six hours before she is "even functional" in the morning and "ready to get out the door."  (R. 60.)  Finally, Plaintiff

could not physically "cope" with an eight-hour job that requires walking or standing for four to six hours a day because "I can't even cope with my own day helping myself."  (R. 60.)

### ii.  Vocational expert testimony

The VE testified that Plaintiff's vocation as a housekeeper or cleaner requires light exertion.  (R. 26–27.)  The ALJ asked the VE to consider a hypothetical individual with the same age, education, and work experience as Plaintiff, with the residual functional capacity ("RFC") to lift twenty pounds occasionally and ten pounds frequently, to sit, stand, and walk for six hours in an eight-hour day, and to frequently climb, balance, stoop, kneel, crouch, crawl, push, and pull, with no limitations in her right or left hand in reaching or in handling but with the limitation that she could "frequently finger" only with her left hand, and with no visual, communicative, or environmental limitations.  (R. 64–65.)  The VE testified that such an individual could perform Plaintiff's prior work.  (R. 65.)  The ALJ then asked whether that same individual could perform Plaintiff's prior work if "because of her pain, she would be off task at least [twenty-five] percent of the time."  (R. 65.)  The VE responded that such an individual could perform neither that work nor "any other job."  (R. 65.)

Plaintiff's counsel asked the VE whether a hypothetical individual who was "limited to only occasional bending," who could only occasionally use her left hand for fine manipulation, who "would be limited to standing and walking for only [two] to [four] hours a day," and who "would have only occasional ability to do frequent stair climbing and also no crouching at all" would be able to do Plaintiff's past work.  (R. 65–66.)  The VE replied that such an individual would not be able to perform Plaintiff's past work or any jobs "at the light level."  (R. 66.)

6

### b.   Relevant medical evidence

#### i.   MRIs of the lumbar and cervical spine

On January 10, 2012, a magnetic resonance imaging ("MRI") scan of Plaintiff's lumbar spine revealed disc bulges at the L2-3, L3-4, L4-5, and L5-S1 levels that impinged on Plaintiff's thecal sac, an L3-4 disc bulge that impinged on the thecal sac and partially compromised the L3-4 neural foramina bilaterally, a grade-I spondylolisthesis at the L3-4 and L5-S1 levels, and minimal degenerative disease.  (R. 354.)

On December 15, 2012, a cervical spine MRI showed posterior central disc herniations at the C3-4, C4-5, C6-7, and C7-T1 levels effacing the corresponding central cerebral spinal fluid spaces with cord contact, a posterior extruded disc herniation at the C5-6 level with spinal cord impingement, no abnormal spinal cord signal intensity, and no anterolisthesis or spondylosis. (R. 355–56.)

On October 30, 2015, a cervical spine MRI revealed no interval changes at the C3-4, C4-5, or C5-6 disc levels since the December 15, 2012 cervical spine MRI.  (R. 502–03.)  At the C6-7 level, there was spondylosis and disc space narrowing, bulging, and a posterior disc herniation with cord contact unchanged.  (R. 502.)  There was moderate bilateral foraminal stenosis greater on the right side with bilateral uncinate process hypertrophy.  (R. 502.)  There was a disc bulge at the C7-T1 level.  (R. 502.)  There was no abnormal cord signal intensity.  (R. 503.)

#### ii.   Jan McIntyre, Nurse Practitioner

On June 4, 2012, Plaintiff saw Nurse Practitioner Janice McIntyre with complaints of cervical back pain, lumbar back pain, and left elbow pain.  (R. 342–44.)  On examination, Plaintiff had no pelvic or ankle instability, her stride was normal, her neck and low back range of motion ("ROM") were restricted in all directions, and her hips and sacroiliac joints were normal

but tender.  (R. 342–43.)  McIntyre noted that Plaintiff's January 10, 2012 lumbar MRI showed

multilevel disc bulges and minimal degenerative change.  (R. 342, 354.)  Muscle spasms were

detected in the left suboccipital, left levator scapula, right paraspinal, left brachioradialis,

bilateral gluteus medius, bilateral piriformis, and bilateral gluteus maximus.  (R. 343.)  McIntyre

administered nerve blocks and trigger point injections.  (R. 343.)

On November 19, 2012, Plaintiff saw McIntyre with complaints of moderate and constant

lower back pain radiating to the left buttock and associated with an aching, burning, sharp pain

that was aggravated by bending and lifting, as well as with complaints of moderate and constant

neck pain associated with an aching, burning, and sharp pain that was aggravated by lifting.  (R.

337.)  Plaintiff told McIntyre about a motor vehicle accident she had in June of 2012 and about

her chiropractic treatment.  (R. 337.)  Upon examining Plaintiff, McIntyre observed that Plaintiff

had moderately reduced cervical and lumbar ROM with tenderness.[5]  (R. 339–40.)  McIntyre

gave her a nerve block and advised her to avoid strenuous activities and to increase her activity

in one or two weeks.  (R. 341.)

On July 9 and August 19, 2013, Plaintiff saw McIntyre with complaints of lower back

pain and general myalgia.  (R. 273, 278.)  Plaintiff reported that nerve block and trigger point

injections were moderately helpful for short periods.  (R. 273, 278.)  McIntyre observed that

Plaintiff exhibited an antalgic gait, moderate muscle spasms in the lumbar paraspinals, and

moderately restricted lumbar spine flexion and extension.  (R. 276, 281.)  McIntyre gave the

same treatment and advice as during Plaintiff's prior visit.  (R. 276–77, 282.)

---

[5]  Normal cervical ROM measurements are: cervical flexion to fifty degrees, extension to sixty degrees, left and right lateral flexion to forty-five degrees, and left and right rotation to eighty degrees.  Normal lumbar ROM measurements are: lumbar flexion to sixty degrees, extension to twenty-five degrees, and left and right lateral flexion to twenty-five degrees.  (R. 428–29.)

On September 16, 2013, and November 11, 2013, Plaintiff saw McIntyre with complaints of neck and lower back pain and general myalgia.  (R. 268, 273.)  Plaintiff stated that nerve block and trigger point injections were moderately helpful for short periods.  (R. 268.)  The exam findings, treatment, and advice were generally the same as Plaintiff's prior visits.  (R. 263–72.)  On December 30, 2013, McIntyre reported that Plaintiff was able to perform the activities of daily living and had no problems ambulating.  (R. 262.)  McIntyre administered nerve blocks and recommended a trial of amitriptyline.  (R. 257–62.)

On January 21, 2014, Plaintiff saw McIntyre with complaints of lower back pain related to falling through ice in March of 2012 and limited ability to walk one block due to pain.  (R. 252.)  Plaintiff had not been to physical therapy ("PT") for one year, as she was discharged for failure to progress.  (R. 252.)  She was inconsistent with home exercise but continued chiropractic care.  (R. 252.)  McIntyre noted results of the cervical spine MRI from December 15, 2012, showing multilevel disc herniation and a larger disc herniation at C5-6 that abutted the cord, and results of the January 2012 cervical spine MRI, showing multilevel disc bulging but no nerve root compression.  (R. 252.)  EMG testing showed no evidence of cervical radiculopathy.  (R. 252.)  Plaintiff was being treated with Hydrocodone, Xanax, and Amitriptyline for arthritis, depression, and headaches.  (R. 253.)  McIntyre's examination of Plaintiff revealed that Plaintiff's cervical spine flexion was limited to thirty degrees and extension was limited to ten degrees.  (R. 254.)  Upper extremity strength was normal.  (R. 254.)  There were moderate muscle spasms of the lumbar spine with pain to palpitation of the right and left lumbar paraspinals.  (R. 254.)  Plaintiff's Patrick's test was positive and her lower extremity strength was normal.  (R. 253.)

On February 10, 2014, Plaintiff returned to McIntyre with complaints of cervicobrachial and lower back pain, stating that she could only walk for a block before her lower back pain worsened and that she could not stand for more than fifteen minutes.  (R. 496–501.)  Plaintiff stated that she felt her dosage of Amitriptyline 25 mg was too strong, that she was awaiting treatment with an epidural steroid injection to the cervical spine, and that she had undergone trigger point and nerve block injections, which were temporarily effective.  (R. 496.)  Her cervical flexion was limited to thirty degrees and extension to ten degrees.  (R. 499.)  McIntyre noted moderate muscle spasm and a positive Patrick's test.  (R. 499.)  Plaintiff received nerve blocks.  (R. 500.)

### iii.   Dr. Fred Carter, M.D.

On November 19, 2013, Dr. Fred Carter, M.D., an orthopedist at North Folk Ortho & Sports Medicine examined Plaintiff for complaints of a six-week history of a "catching sensation" in her left thumb (i.e., left trigger thumb).  (R. 513–14.)  Upon examination, Dr. Carter observed that Plaintiff's neck was supple and had full and painless ROM, and that there were no muscle spasms.  (R. 513.)  Dr. Carter reported that Plaintiff's upper extremities had full (5/5) strength, full ROM, and were neurovascularly intact.  (R. 513.)  In addition, the left thumb had tenderness over the A1 pulley and a palpable thickening of the flexor tendon.  (R. 513.)  Plaintiff had multiple thickening of other tendons of the other digits of both hands but no palpable catching sensation.  (R. 513.)  Dr. Carter diagnosed Plaintiff with trigger finger and administered a cortisone injection into her left thumb.  (R. 514.)

On June 14, 2014, Plaintiff returned to Dr. Carter complaining of pain and a "catching sensation" in her left thumb.  (R. 512.)  Dr. Carter explained that the cortisone injections worked on a short-term basis but did not provide long-term relief, and Plaintiff explained that she wished

to undergo surgery.  (R. 512.)  Two days later, on June 26, 2014, Dr. Carter performed surgery.

(R. 515.)  Dr. Carter saw Plaintiff on July 7, 2014, for a follow-up appointment and Plaintiff

denied any numbness, tingling, or loss of sensation.  (R. 510.)

### iv.   Jeffrey Nazar, D.C., chiropractor

On February 5, 2014, chiropractor Jeffrey Nazar, D.C., completed a questionnaire about

Plaintiff for the New York State Office of Temporary and Disability Assistance regarding her

claim for DIB.  (R. 347–351.)  Nazar diagnosed Plaintiff with cervalgia, lower back pain, and

pain in limb.  (R. 347.)  He stated that she had neck pain with "radiation of numbness and

tingling in her extremities" and that she complained of mid-to-lower back pain that was at times

very intense.  (R. 347.)  He treated Plaintiff with adjustments of the cervical, thoracic, and

lumbar spine, ultrasound, moist heat, and therapeutic exercise.  (R. 348.)  He stated that Plaintiff

had a history of hypoesthesia to both arms due to a motor vehicle accident in June of 2012, and

that her bicep and wrist deep tendon reflexes and muscle strength were reduced in the cervical

and lumbar spine.  (R. 348.)  In addition, her cervical and lumbar ROMs were reduced.  (R. 353.)

He indicated that Plaintiff's gait was unsteady at times due to leg and muscle weakness and

noted that she used a cane and a back brace.  (R. 350.)  In addition, he opined that Plaintiff was

unable to lift, push, or pull objects weighing over ten pounds and that doing so would increase

her neck and back pain.  (R. 350.)  On the form, he marked boxes indicating the following

limitations: Plaintiff could lift or carry up to ten pounds only occasionally (up to one-third of an

eight-hour workday), she could stand and/or walk for less than two hours per workday, she could

sit for one to two hours in a workday with frequent position changes from sitting to standing, and

she had limited ability to push and/or pull.  (R. 350–51.)

### v.   Paul Herman, Ph.D., consultative examiner

On March 5, 2014, Plaintiff attended a psychiatric consultative examination with Paul Herman, Ph.D.  (R. 357.)  Plaintiff told Herman that she worked as a part-time housekeeper until she was laid off in 2001[6] and thereafter was "a stay-at-home mom" who supported herself with child support payments.  (R. 357.)  She stated that her current lack of employment was primarily due to her physical issues but also due to never having functioned appreciably outside of her homemaker status and that she felt that her years of not working made her work skills "no longer sharp."  (R. 357–58.)  She stated that she lived with her twenty-three-year-old son and socialized with friends, and she reported good family relationships.  (R. 359.)  Plaintiff said that she occupied her time with household tasks and Alcoholics Anonymous meetings.  (R. 359.)

### vi.   Chaim Shtock, D.O., consultative examiner

Also on March 5, 2014, Dr. Chaim Shtock, D.O., completed an orthopedic consultative examination of Plaintiff.  (R. 361.)  Plaintiff complained of lower back pain since 2003 and reported that she had ignored this pain but was eventually referred to pain management.  (R. 361.)  Plaintiff stated that she was in a motor vehicle accident in June of 2012 that resulted in injuries to her neck and lower back, and that she had been treated by a chiropractor two to three times a week.  (R. 361.)  She reported having an MRI of the cervical or lumbar spine in 2013 and described the neck pain as a dull burning pain that was aggravated by prolonged sitting and turning and bending her neck.  (R. 361.)  She complained of lower back pain, which she rated an eight to a ten on a scale from one to ten.  (R. 361.)  The lower back pain was aggravated by prolonged sitting and standing, excessive bending, heavy lifting, and prolonged walking.  (R.

---

[6]  This date is consistent with Plaintiff's earnings records, which show no reported earnings after 2001.  (R. 187.)

361.)  She stated that she was diagnosed with fibromyalgia in 2013 and had migraines and

asthma.  (R. 361–62.)  She mentioned episodic numbness in her hands, mostly at night.  (R. 361.)

In addition, she reported that she took Vicodin as needed for pain.  (R. 362.)  Plaintiff stated that

she showered, dressed, and groomed herself independently, did light cooking, light cleaning,

laundry, and shopping, and spent her time watching television and going to Alcoholics

Anonymous meetings.  (R. 362.)

 Dr. Shtock observed that Plaintiff rose from a chair without difficulty, was able to get on

and off the exam table without difficulty, walked with a normal gait, and did not use an assistive

device.  (R. 362–63.)  In addition, she exhibited difficulty walking on her heels, refused to walk

on her toes, and could not squat beyond fifty percent.  (R. 363.)  Plaintiff was able to stand

normally.  (R. 363.)  She declined to change for the exam.  (R. 363.)  Her hand and finger

dexterity were intact, and her grip strength was 4+/5.  (R. 363.)  Dr. Shtock found reduced ROM

of the cervical and lumbar spine (cervical spine flexion to forty degrees, extension to thirty-five

degrees, rotation to fifty-five degrees, and side bending to thirty-five degrees; lumbar spine

flexion to thirty degrees, extension to zero degrees, and lateral flexion and rotary movements

between fifteen degrees and twenty degrees and limited due to pain).  (R. 363.)  Plaintiff

complained of tenderness in the cervical paraspinal and trapezius muscles and tenderness in the

lumbar paraspinal muscles and the left sacroiliac joint.  (R. 363.)  Dr. Shtock found no trigger

points, muscle spasms, effusion, instability, or muscle atrophy, and near-full muscle strength at

4+/5 and 5/5.  (R. 363.)  Plaintiff retained full ROM in her upper and lower extremities.  (R.

343.)  Plaintiff's reflexes were unremarkable.  (R. 363.)  Dr. Shtock found no sciatic notch

tenderness, scoliosis, or kyphosis, and no sensory abnormalities in the lower extremities.  (R.

363.)  Dr. Shtock diagnosed Plaintiff with neck and lower back pain, status post C-section, and

reported histories of motor vehicle accident, depression, anxiety, asthma, and fibromyalgia.  (R. 363–64.)

Dr. Shtock opined that Plaintiff had mild-to-moderate limitations with kneeling, standing long periods, and sitting long periods; moderate limitations with heavy lifting, squatting, frequent stair climbing, and walking long distances; moderate-to-marked limitations with crouching and frequent bending; no limitations with performing overhead activities with both arms, using both hands for fine and gross manual activities; and no other physical functional limitations.  (R. 363.)

### vii.   Dr. Philippe Vaillancourt, M.D.

On March 6, 2014, Plaintiff saw Dr. Philippe Vaillancourt at South Shore[7] for complaints of neck and lower back pain.  (R. 490.)  Vaillancourt's exam findings were generally consistent with Nurse McIntyre's February 10, 2014 report: cervical flexion was measured at thirty degrees and extension to ten degrees.  (R. 493.)  In addition, Plaintiff's gait, balance, and coordination were intact, her upper and lower extremity strength were normal, and her deep tendon reflexes were preserved.  (R. 493–94.)  Vaillancourt administered nerve blocks and trigger point injections.  (R. 494.)

Plaintiff saw Vaillancourt a second time on September 9, 2014.  (R. 452.)  On examination of Plaintiff, Vaillancourt noted pain at the sacroiliac joints and a positive Patrick's test on both the left and right sides.  (R. 455.)  Lumbar flexion was limited to twenty degrees and extension to five degrees.  (R. 455.)  Rotation of the lumbar spine was limited by severe pain. There was marked tightness of the paraspinal muscles.  (R. 455.)  Vaillancourt noted that Plaintiff seemed to be responding to nerve block injections, trigger point injections, and PT.  (R.

---

[7]  The same practice where Nurse McIntyre treated Plaintiff.  (Comm'r Mem. 8 n.7.)

456.)  He advised Plaintiff to continue her current treatment and administered trigger point injections.  (R. 452, 455–56.)

### viii.   Mary Chatterton, physical therapist

Beginning in April of 2014, shortly after her first visit with Dr. Vaillancourt on March 6, 2014, and continuing through the end of 2014, Plaintiff met regularly with physical therapist Mary Chatterton, also at South Shore.

On April 14, 2014, Plaintiff reported to Chatterton that her lower back pain had worsened during the last year and a half to two years, and she complained of a tingling sensation and numbness in her legs when standing.  (R. 486.)  She also reported that "[s]he goes with her dog to [the] beach almost every afternoon, but some days she cannot walk at all and other days she can a bit, but then she pays for it."  (R. 486.)  Chatterton reported cervical ROM measurements of flexion to thirty degrees, extension to ten degrees, right lateral flexion to twenty degrees, left lateral flexion to sixty degrees, right rotation to seventy degrees, and left rotation to twenty degrees.  (R. 487.)  Chatterton reported pain at the sacroiliac joint on the left and right side and positive Patrick's tests on both sides.  (R. 488.)  Chatterton also reported lumbar ROM measurements of flexion to twenty degrees, extension to five degrees, left and right lateral flexion to ten degrees, and limited rotation due to severe pain.  (R. 488.)  Chatterton stated that Plaintiff would benefit from manual PT, a gradual increase in exercise, and general conditioning. (R. 488.)  Chatterton provided PT on May 5, 2014, after which Plaintiff reported feeling better than she had in a long time.  (R. 485.)

On May 14, 2014, Plaintiff saw Chatterton and said that she felt she had "some lasting benefit" from the PT session nine days earlier, though her neck and lower back were still in pain. (R. 478.)  Chatterton observed that Plaintiff's affect had improved overall, with lumber spine

flexion increased to sixty degrees and cervical rotation to fifty-five degrees (left) and seventy degrees (right).  (R. 478.)  On May 19, 2014, Plaintiff saw Chatterton and reported that she "felt notably improved after [her] last visit and became over zealous [sic]," as a result of which "[s]he lifted up a case of water and felt immediate pain from the low back to the neck."  (R. 476.)  Chatterton modified Plaintiff's PT to decrease lumbar pain and noted a decrease in pain and an improvement in overall functional mobility.  (R. 476.)

On June 23, 2014, Chatterton reported that Plaintiff described two to three days of decreased pain following her last PT session.  (R. 467.)  Plaintiff felt she needed to learn not to overextend herself when she was feeling better.  (R. 467.)  Chatterton noted that Plaintiff "did a lot of moving around . . . that included stair climbing" the previous weekend and mentioned increased lumbar spine pain.  (R. 467.)  Chatterton observed "increased slowness in position changes," a decrease in lumber flexion to forty-five degrees, and muscle tightness.  (R. 467.)

On July 14, 2014, Plaintiff mentioned her recent trigger finger surgery[8] and stated that she had been unable to perform PT neck and back exercises because of pain and stiffness.  (R. 466.)  Chatterton again observed reduced flexion of the lumbar spine to forty-five degrees with pain across the back and muscle tightness.  (R. 466.)  On July 30, 2014, Plaintiff told Chatterton that she felt PT was working and that she had greater flexibility that lasted a little longer after each session.  (R. 460.)  Chatterton found that Plaintiff's forward flexion had improved slightly to fifty degrees.  (R. 460.)

On August 18, 2014, Plaintiff said that her response to PT "lasts for at least [three] days following treatment" but that she felt "shot" that day because she had "lifted a bag of clothes into

_____

[8]  On June 26, 2014, Dr. Carter performed surgery on Plaintiff's thumb for left trigger thumb.  (R. 515.)

a bin and is paying for it." (R. 459.)  Flexion of the lumbar spine was limited to fifty degrees and there was marked tightness in the bilateral lumbar paraspinals, quadrilateral, and lumbosacral fascia into the buttocks. (R. 459.)  There was end range tightness in cervical spine ROM and marked tightness in the rhomboid, paraspinal, trapezius, and suboccipital muscles. (R. 459.)

On September 4, 2014, Plaintiff saw Chatterton and said that she walked a lot at campus the previous day and wanted to do more with her photography class. (R. 458.)  Chatterton instructed Plaintiff to begin small, ten- to thirty-minute walks with her camera "in preparation for activities that would demand longer days." (R. 458.)  On September 8, 2014, Plaintiff told Chatterton that she "typically overdoes it," and Chatterton noted decreased cervical left rotation with decreased joint play and marked tightness. (R. 457.)

On September 29, 2014, Plaintiff saw Jenna Levchuck, a different physical therapist at South Shore, and told her that PT had provided some relief since her last visit. (R. 450.)  On October 9, 2014, Chatterton noted that Plaintiff complained of "increased pain throughout the neck and back now that she is enrolled in a photography class and spends more time on the computer." (R. 449.)  There was significant tightness throughout the back, and lumbar ROM was moderately limited with pain while cervical ROM was limited. (R. 449.)  On December 1, 2014, Chatterton reported that Plaintiff is "in photography class that challenges her physically and increases pain but it is important to her." (R. 438.)  Plaintiff stated that she has "good and bad days" and that she felt "pain across the lumbar spine that increases with bending and time on feet." (R. 438.)

On December 8, 2014, Chatterton reported "[o]ngoing complaints of pain in the lumbar and cervical spine" and "[i]ncreased pain [in the] last [two] weeks with intermittent numbness into the left hand." (R. 437.)  Chatterton noted "increased tightness throughout the left cervical

region with decreased left rotation" and "decreased joint play," as well as marked muscle

tightness.  (R. 437.)  On December 15, 2015, Chatterton again noted marked muscle tightness

and decreased left cervical rotation with decreased cervical joint play.  (R. 436.)

### ix.   Patricia Grant, Nurse Practitioner

During the latter half of 2014, during which time Plaintiff regularly attended PT with

Chatterton, Plaintiff also regularly saw Nurse Practitioner Grant at South Shore.

On May 12, 2014, after her first two PT sessions with Chatterton, Plaintiff saw Grant for

complaints of neck and back pain.  (R. 479.)  Grant noted that Plaintiff had been attending PT

and chiropractic sessions and was responding to those treatments.  (R. 479.)  Grant reported

cervical flexion to thirty degrees, extension to ten degrees, lateral flexion to twenty degrees

(right) and sixty degrees (left), and rotation to seventy degrees (right) and twenty degrees (left).

(R. 482.)  In addition, Grant reported pain at the sacroiliac joint on the left and right sides and

positive Patrick's tests at the left and right sides.  (R. 483.)  Plaintiff's lumbar flexion was to

twenty degrees, lateral flexion to ten degrees on the left and right sides, extension to five

degrees, and limited rotation due to pain.  (R. 483.)  Grant observed that "[g]eneral

deconditioning is evident."  (R. 483.)  Plaintiff's lower extremities exhibited normal strength and

were neurovascularly intact.  (R. 483.)  Grant gave Plaintiff a nerve block.  (R. 484.)

On June 17, 2014, Plaintiff returned to Grant complaining of neck and back pain and

stated that trigger point and nerve block injections were effective for one and a half weeks after

her last treatment.  (R. 468.)  Plaintiff's cervical and lumbar ROM were unchanged from the

prior exam.  (R. 470–71.)  Grant administered a nerve block.  (R. 472.)

On July 28, 2014, Plaintiff returned to Grant with complaints of axial pain.  (R. 461.)

Plaintiff reported that her injections were very effective for two weeks after her last treatment

and that her functional level had improved and that she felt able to try a photography course. (R. 461.) Clinical findings were unchanged, except for a marked decrease in soft tissue and fascial mobility in the upper thoracic region and the cervicothoracic and suboccipital region. (R. 463–64.) Grant administered a nerve block. (R. 464.)

On October 13, 2014, Plaintiff saw Grant for treatment of cervical, brachial, and lumbopelvic pain. (R. 444.) Plaintiff reported that the prior injections were effective and well tolerated. (R. 444.) Cervical flexion was measured at thirty degrees, extension to ten degrees, lateral flexion to twenty degrees (right) and sixty degrees (left), and rotation to seventy degrees (right) and twenty degrees (left). (R. 446.) There was a marked decrease in soft tissue and fascial mobility in the upper thoracic region and the cervicothoracic and suboccipital region. (R. 446.) At the lumbar spine, Grant noted pain at the sacroiliac joint on the left and right and positive Patrick's tests on both sides. (R. 446.) Lumbar flexion was limited to twenty degrees and extension to ten degrees. (R. 446.) Rotation of the lumbar spine was limited by severe pain. (R. 446.) There was marked tightness of the paraspinal muscles, general deconditioning was evident, and abdominal strength was rated at 3-/5. (R. 446.) Grant administered trigger point injections to the right levator scapula, upper trapezius, and lower cervical paraspinal. (R. 447.)

On November 10, 2014, Grant noted that Plaintiff "is attending a photography course which she loves and is causing her severe pain and discomfort." (R. 439.) Examination revealed tenderness of the trapezius, suboccipital, scalene, levator scapular, and paraspinal muscles. (R. 441.) Grant described Plaintiff's rotation as limited and characterized rotation pain as severe, with severe restriction on flexion, in motor tests. (R. 441.) Grant administered a nerve block injection. (R. 442.)

      **x.**    **Marcel Frey, D.C., chiropractor**

On December 6, 2014, Plaintiff saw Marcel Frey, D.C., for chiropractic treatment.  (R.

427–34.)  Cervical flexion was limited to twenty-five degrees, extension to twenty degrees, right

and left lateral flexion to fifteen degrees, left rotation to thirty degrees, and right rotation to

twenty degrees.  (R. 427.)  A Spurling's test[9] was positive, and a Soto-Hall test was positive on

the right side.  (R. 428.)  Bicep, tricep, and brachioradialis reflexes were 1+ (slightly

diminished).  (R. 428.)  Lumbar flexion was limited to forty degrees, extension to fifteen

degrees, and right and left lateral flexion to ten degrees.  (R. 429.)  A Kemp's test was positive

bilaterally.  (R. 429.)

      **c.**    **The ALJ's decision**

The ALJ concluded that Plaintiff "has not been under a disability within the meaning of

the Social Security Act since January 15, 2014."  (R. 25.)  In arriving at this conclusion, the ALJ

conducted the five-step sequential analysis required by the SSA.  20 C.F.R. § 416.920(a).

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity

since January 15, 2014, her SSI application date.[10]  (R. 27.)  At step two, the ALJ found that

Plaintiff has two severe impairments — degenerative disc disease of the lumbar spine and

---

      [9]  A Spurling's test is an "evaluation for cervical nerve root impingement in which the patient extends [her] neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain."  *Guy v. Astrue*, 615 F. Supp. 2d 143, 149 n.6 (S.D.N.Y. 2009) (quoting Stedman's Medical Dictionary).

      [10]  "'Substantial gainful activity' . . . is defined as work activity that is both substantial and gainful.  'Substantial work activity' is work activity that involves doing significant physical or mental activities."  (R. 26 (citing 20 C.F.R. § 416.972(a)).)  "'Gainful work activity' is work that is usually done for pay or profit, whether or not a profit is realized."  (R. 26 (citing 20 C.F.R. § 416.972(b))).

degenerative disc disease of the cervical spine.[11]  (R. 27.)  At step three, the ALJ found that

Plaintiff's impairments do not meet or medically equal the severity of any of the listed

impairments in 20 C.F.R. §§ 416.920(d), 416.925, or 416.926.  (R. 29.)

At step four, the ALJ found that Plaintiff has the RFC to perform the full range of light

work as defined in 20 C.F.R. § 416.967(b).  (R. 29.)  The ALJ found that "[t]he medical evidence

of record establishes medically determinable impairments of degenerative disc disease of the

lumbar spine and . . . of the cervical spine, which can be expected to produce the symptoms

[Plaintiff] has described," however, "a review of the objective medical evidence as well as the

subjective considerations enumerated in SSR 96-7 shows that the [Plaintiff's] statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely

credible."  (R. 30.)

The ALJ indicated that he relied on the medical evidence as well as opinion evidence.

(R. 29.)  Based on Plaintiff's MRIs, examination findings of reduced cervical and lumbar spine

ROM, examination findings of paraspinal and sacroiliac joint tenderness, and documented course

of treatment dating back to 2012 and consisting of nerve block and trigger point injections, PT,

chiropractic adjustments, and prescribed medications, as well as Plaintiff's subjective complaints

of increased pain with exertion, the ALJ found that Plaintiff is limited to "lifting and carrying up

to [twenty pounds] occasionally and up to [ten] pounds frequently."  (R. 30–31.)  The ALJ

---

[11]  The ALJ also found that the evidence does not establish clinical signs of fibromyalgia, that Plaintiff's history of "left thumb trigger finger" does not meet the duration requirement to establish a disabling impairment, and that "left thumb trigger finger" is a nonsevere impairment. (R. 27.)  Plaintiff does not challenge any of these findings.

explained that while Plaintiff "testified to a limited capacity for lifting and carrying,[12] the office visit notes document clinical findings of normal upper extremity strength and sensation as well as normal fine motor skills."  (R. 31 (citing R. 248–346 (McIntyre notes); R. 436–501 (Chatterton, Grant, and Vaillancourt notes)).)  In addition, "[s]ensory nerve conduction studies on the upper extremities were 'normal.'"  (R. 31 (citing R. 248–346 (McIntyre notes)).)  The ALJ further determined that, despite Plaintiff's "complaints of a limited capacity for walking, her neurologist, as well as the neurologist's nurse practitioner, have consistently found that she has normal lower extremity strength and sensation," and "[t]he neurologist has noted that [her] 'balance and gait [are] intact.'"  (R. 31 (citing R. 248–346, 436–501).)

"Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence," the ALJ considered additional factors to assess the credibility of Plaintiff's statements.  (R. 31.)  The ALJ explained that Plaintiff "has described daily activities which are not limited to the extent one would expect given the complaints of disabling symptoms and limitations," including cleaning her home, taking care of herself, going to doctor appointments, caring for a dog, and taking an on-campus photography course, which she told her treating sources was "physically demanding" and involved "carrying heavy equipment" and sitting at a computer.  (R. 31, 449.)  In addition, the ALJ noted that Plaintiff "has not generally received the type of medical treatment one would expect for an individual experiencing the debilitating symptoms [she] has described" but rather has received "relatively conservative" treatment and "been maintained on the same medications

---

[12]  At the December 2014 hearing, the ALJ asked Plaintiff: "Now, you previously said you lift jugs, I'm not sure what a jug is.  A gallon of milk is like eight pounds, can you lift a gallon of milk?"  (R. 56.)  Plaintiff responded: "I buy a half gallon because the jug is too heavy." (R. 56.)

for more than two years," indicating "that they are effective in controlling her symptoms."  (R.

31.)  The ALJ also noted that, although Plaintiff "testified to frequent emergency room visits for

pain and having to lie in bed for two or three days after minimal exertion, none of this is

documented in the medical evidence."  (R. 32.)  Finally, the ALJ stated that Plaintiff's claim of

being disabled since 2011 undermined the credibility of her allegations because "her earnings

record shows no earnings since 2001, and she testified that she has not worked since 2003 or

2004 (off the books)."  (R. 32.)

Turning to the medical opinion evidence, the ALJ assigned "partial weight" to

consultative examiner Dr. Shtock's March 5, 2014 opinion that Plaintiff has moderate limitations

for walking long distances and mild to moderate limitations for standing long periods and sitting

long periods because "the limitations for walking, sitting, and standing are inconsistent with [Dr.

Shtock's] clinical examination, which showed that [Plaintiff] had a normal gait and stance, that

she could mount and dismount the exam table without assistance, that she could rise from a chair

without difficulty, and that she had 4+/5 to 5/5 strength, no atrophy, and no sensory abnormality

in the lower extremities."  (R. 32; *see* R. 362–63 (Dr. Shtock's opinion).)  The ALJ added that

Dr. Shtock's opinions as to these limitations were also inconsistent with physical therapist

Chatterton's contemporaneous treatment notes showing that Plaintiff had normal lower extremity

strength, that she reported going to the beach with her dog "almost every day," and stating that

Plaintiff "would benefit from an 'increase in exercise.'"  (R. 32; *see* R. 486–88 (Chatterton's

April 14, 2014 notes).)  The ALJ gave "good weight" to Dr. Shtock's opinion that Plaintiff has

"moderate-to-marked limitations for crouching and frequent bending[,] . . . that she has moderate

limitations for heavy lifting, squatting, [and] frequent stair climbing, . . . that she has mild-to-

moderate limitations for kneeling, . . . and that she has no limitations for performing overhead

activities using both arms or using both hands for fine and gross manual activities" because these findings were "consistent with [Plaintiff's] reduced range of motion and treatment history."  (R. 32.)

At step five, the ALJ found that Plaintiff is capable of performing past relevant work as a housekeeper because "she has been employed in the past as a housekeeper for a sufficient period of time to earn income equivalent to substantial gainful activity and to learn to perform the requirements of that position adequately."  (R. 32.)  Based on his conclusion that Plaintiff's RFC limits her to light work and the VE's testimony, which was consistent with the information in the Dictionary of Occupational Titles, that housekeeping is performed at the light level of exertion, the ALJ concluded that Plaintiff could continue to perform work as a housekeeper.  (R. 32.)  In addition, the ALJ found that Plaintiff was "an individual closely approaching advanced age[] on the date the application was filed," (R. 33 (citing 20 C.F.R. § 416.963)), and that she has at least a high school education and is able to communicate in English, (R. 33).  Based on these findings, the ALJ concluded in the alternative that, "[a]lthough [Plaintiff] is capable of performing past relevant work, . . . considering [her] age, education, work experience, and [RFC], there are other jobs that exist in significant numbers in the national economy that [she] also can perform."  (R. 33.)  Accordingly, the ALJ concluded that Plaintiff was "not disabled."  (R. 33.)

## II.   Discussion

### a.   Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per

curiam).  "Substantial evidence means more than a mere scintilla.  It means such relevant
evidence as a reasonable mind might accept as adequate to support a conclusion."  *Sczepanski v.
Saul*, 946 F.3d 152, 157 (2d Cir. 2020) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.
2009)); *see also Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (per curiam) (same);
*McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same).  Once an ALJ finds facts, the court
"can reject those facts 'only if a reasonable factfinder would *have to conclude otherwise*.'"
*Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 28 F.3d
1287, 1290 (8th Cir. 1994)).  In deciding whether substantial evidence exists, the court "defer[s]
to the Commissioner's resolution of conflicting evidence."  *Cage v. Comm'r of Soc. Sec.*, 692
F.3d 118, 122 (2d Cir. 2012); *see also McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to
more than one rational interpretation, the Commissioner's conclusion must be upheld.").  The
Commissioner's factual findings "'must be given conclusive effect' so long as they are supported
by substantial evidence."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (quoting
*Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).  If, however, the Commissioner's
decision is not supported by substantial evidence or is based on legal error, a court may set aside
the Commissioner's decision.  *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see also
Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  "In making such determinations, courts
should be mindful that '[t]he Social Security Act is a remedial statute which must be "liberally
applied"; its intent is inclusion rather than exclusion.'"  *McCall v. Astrue*, No. 05-CV-2042, 2008
WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v.
Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

**b.    Substantial evidence does not support the ALJ's finding that Plaintiff has the RFC to perform the full range of light work**

Plaintiff argues that substantial evidence does not support the ALJ's step-four finding that she has the RFC to perform the full range of light work under 20 C.F.R. § 416.967(b).  (Pl.'s Mem. 18–20.)  In support, Plaintiff argues that light work "necessarily requires 'a good deal' of standing or walking" — that is, standing or walking, off and on, for a total of approximately six hours of an eight-hour workday — and "also necessarily requires [an] individual to be capable of lifting and carrying [twenty] pounds occasionally throughout the workday . . . and up to [ten] pounds frequently throughout the workday."  (*Id.* at 18 (first citing 20 C.F.R. § 416.967(b); and then citing SSR 83-10, 1983 WL 31251 (Jan. 1, 1983))).  Relying on the opinions of consultative examiner Dr. Shtock and her chiropractor, Dr. Nazar, Plaintiff argues that the record does not support a finding that she has "the capacity for standing and walking for [six] hours in an [eight]-hour workday" or "that she could somehow lift and carry up to [twenty] pounds occasionally and [ten] pounds frequently."  (*Id.* at 18–19.)  Rather, Plaintiff argues that her treating sources "consistently documented significantly reduced range flexion" of the cervical and lumbar spine, as well as muscle spasms, both of which constitute objective evidence of disability.  (*Id.* at 19.)  Plaintiff argues that the ALJ neglected these facts and instead "substitute[d] his own lay judgment of what the evidence show[ed] and dispense[d] with Dr. Shtock's moderate limitation for prolonged walking and mild to moderate limitations for standing and sitting."  (*Id.* at 20.)

The Commissioner argues that the ALJ "considered all the evidence of record and reasonably found that Plaintiff retained the ability to perform work at the light level of exertion."  (Comm'r Mem. 18–25.)  In support, the Commissioner argues that the ALJ considered Plaintiff's chiropractic treatment from Dr. Nazar, (R. 30–31 (stating that exhibit 2F, containing the form Dr. Nazar completed, was considered); R. 340, 350–51 (form)), and plainly accorded it "little, if any,

weight" because it was contradicted by multiple reports from Dr. Vaillancourt, nurse

practitioners McIntyre and Grant, and Dr. Shtock, which "generally reported no lower extremity

weakness." (*Id.* at 19.)  In addition, the Commissioner argues that Plaintiff's chiropractors "are

not acceptable medical sources" because chiropractors were not listed as such in the regulations

that were in effect at the time of the ALJ's decision.  (*Id.* at 20.)  The Commissioner further

argues that, although "Plaintiff correctly states that there were multiple reports of reduced ROM

of the lumbar and cervical spine, . . . [e]xam findings revealed no muscle spasm, trigger points,

effusion, or instability," there were "no sensory abnormalities in the lower extremities," and

"[t]he exam revealed that she retained full ROM in her upper and lower extremities." (*Id.* (citing

R. 363 (Dr. Shtock's opinion)).)  Finally, the Commissioner argues that Dr. Shtock's opinions

that Plaintiff had mild to moderate limitations with standing and sitting long periods and

moderate limitations with walking long distances, which the ALJ gave partial weight due to

inconsistencies with his clinical exam findings, supported the finding that she is capable of light

work because such limitations are consistent with light work.  (*Id.* at 20–21.)

An RFC determination specifies the "most [a claimant] can still do despite [the

claimant's] limitations." 20 C.F.R. § 404.1545(a)(1); *Barry v. Colvin*, 606 F. App'x 621, 622 n.1

(2d Cir. 2015); *Penny Ann W. v. Berryhill*, No. 17-CV-1122, 2018 WL 6674291, at *4 (N.D.N.Y.

Dec. 19, 2018).  With respect to a claimant's physical abilities, an RFC determination indicates

the "nature and extent" of a claimant's physical limitations and capacity for work activity on a

regular and continuing basis.  20 C.F.R. § 404.1545(b).  For example, "a limited ability to

perform certain physical demands of work activity, such as sitting, standing, walking, lifting,

carrying, pushing, pulling or other physical functions (including manipulative or postural

functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability

to do past work and other work." *Id.* "In determining a claimant's RFC, '[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history.'" *Perez v. Berryhill*, No. 17-CV-3045, 2019 WL 1324949, at *4 (E.D.N.Y. Mar. 25, 2019) (alteration in original) (quoting *Crocco v. Berryhill*, No 15-CV-6308, 2017 WL 1097082, at *15 (E.D.N.Y. Mar. 23, 2017)); *see also Barry*, 606 F. App'x at 622 n.1 ("In assessing a claimant's RFC, an ALJ must consider 'all of the relevant medical and other evidence,' including a claimant's subjective complaints of pain." (quoting 20 C.F.R. § 416.945(a)(3))). An ALJ "may not 'arbitrarily substitute [his] own judgment for competent medical opinion.'" *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) (quoting *Balsamo*, 142 F.3d at 81); *Santangelo v. Saul*, No. 18-CV-6199, 2019 WL 4409339, at *8 (W.D.N.Y. Sept. 16, 2019) ("[A]n ALJ who makes an RFC determination in the absence of a supporting medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." (quoting *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347–48 (E.D.N.Y. 2010))).

A district court must ensure that the ALJ has adequately developed the record in accordance with 20 C.F.R. § 404.1520(a)(3), which requires an ALJ to consider all evidence in the case record when making a determination or decision on a claimant's disability. *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009) ("[I]t is the rule in our circuit that the [social security] ALJ, unlike a judge in a trial, must [on behalf of all claimants] . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." (alterations in original) (quoting *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999))). Although a "claimant has the general burden of proving that he or she has a disability

within the meaning of the Act," *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citing

*Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)), "[b]ecause a hearing on disability

benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to

develop the administrative record," *id.* (alteration in original) (quoting *Melville v. Apfel*, 198 F.3d

45, 51 (2d Cir. 1999)); *see also Yucekus v. Comm'r of Soc. Sec.*, 829 F. App'x 553, 558 (2d Cir.

2020) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to

develop a claimant's medical history even when the claimant is represented by counsel[.]"

(alterations in original) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *Tankisi v.

Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 n.1 (2d Cir. 2013) ("Unlike a judge at trial, the ALJ

has a duty to 'investigate and develop the facts and develop the arguments both for and against

the granting of benefits.'" (quoting *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir.

2011))).  This duty is present "[e]ven when a claimant is represented by counsel."  *Moran*, 569

F.3d at 112 (collecting cases); *see also Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir.

2014) ("[T]he ALJ's general duty to develop the administrative record applies even where the

applicant is represented by counsel . . . ." (citing *Rosa*, 168 F.3d at 79)); *Rockwood v. Astrue*, 614

F. Supp. 2d 252, 279 (N.D.N.Y. 2009) ("[A]n ALJ has an affirmative duty to develop the record,

even if the claimant is represented by counsel, if the medical record is ambiguous or

incomplete." (first citing *Tejada*, 167 F.3d at 774; and then citing *Rosa*, 168 F.3d at 79)).  In

addition, the ALJ must attempt to fill in gaps in the record.  *See Blash v. Comm'r of Soc. Sec.

Admin.*, 813 F. App'x 642, 645 (2d Cir. 2020) ("When there is an obvious or 'clear gap[]' in the

record, the ALJ is required to seek out missing medical records, even when a party is represented

by counsel." (alteration in original) (quoting *Rosa*, 168 F.3d at 79)); *Rosa*, 168 F.3d at 79 & n.5

(explaining that the ALJ must attempt to fill "clear gaps" in the record, but "where there are no

obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996))).

The duty to develop "includes ensuring that the record as a whole is complete and detailed enough to allow the ALJ to determine the claimant's RFC." *Sigmen v. Colvin*, No. 13-CV-268, 2015 WL 251768, at *11 (E.D.N.Y. Jan. 20, 2015) (citing *Casino-Ortiz v. Astrue*, No. 06-CV-155, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007), *report and recommendation adopted*, 2008 WL 461375 (S.D.N.Y. Feb. 20, 2008)). Pursuant to the SSA regulations, the Commissioner is obligated to "make every reasonable effort to help [the claimant] get medical evidence from [his] own medical sources and entities that maintain [his] medical sources' evidence when [the claimant] give[s] . . . permission to request the reports." 20 C.F.R. § 404.1512(b)(1); *see also Perez*, 77 F.3d at 47. The Commissioner's duty to make such efforts includes the duty to seek, as part of such medical evidence and reports, a medical source statement or functional assessment detailing the claimant's limitations. *See Robins v. Astrue*, No. 10-CV-3281, 2011 WL 2446371, at *3 (E.D.N.Y. June 15, 2011) ("Social Security Ruling 96–5p confirms that the Commissioner interprets those regulations to mean that '[a]djudicators are generally required to request that acceptable medical sources provide these statements with their medical reports.'" (alteration in original) (quoting SSR 96-5p, 1996 WL 374183 (July 2, 1996))). Failing to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding for further findings. *See Rosa*, 168 F.3d at 83 (finding remand "particularly appropriate" where the ALJ failed to obtain adequate information from treating physicians and potentially relevant information from other doctors); *see also Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018) ("Failure to develop the record warrants remand."); *Green v.*

*Astrue*, No. 08-CV-8435, 2012 WL 1414294, at *14 (S.D.N.Y. Apr. 24, 2012) ("[F]ailure to

develop the record adequately is an independent ground for vacating the ALJ's decision and

remanding the case." (citing *Moran*, 569 F.3d at 114–15)), *report and recommendation adopted*,

2012 WL 3069570 (S.D.N.Y. July 26, 2012).

      Nevertheless, "under certain circumstances, an ALJ permissibly can render a common

sense judgment about functional capacity even without a physician's assessment."  *Hogans v.

Comm'r of Soc. Sec.*, No. 19-CV-2737, 2020 WL 5496114, at *14 (S.D.N.Y. Sept. 11, 2020)

(quoting *Santillo v. Colvin*, No. 13-CV-8874, 2015 WL 1809101, at *10 (S.D.N.Y. Apr. 20,

2015)).  "These include (a) where the medical evidence shows relatively little physical

impairment, and (b) where the record contains sufficient evidence from which an ALJ can assess

the RFC."  *Thomas M. N. v. Comm'r of Soc. Sec.*, No. 19-CV-360, 2020 WL 3286525, at *4

(N.D.N.Y. June 18, 2020) (citing *Penny Ann W.*, 2018 WL 6674291, at *4); *see also Monroe v.

Comm'r of Soc. Sec.*, 676 F. App'x 5, 8–9 (2d Cir. 2017) ("Where . . . 'the record contains

sufficient evidence from which an ALJ can assess the [claimant's RFC], a medical source

statement or formal medical opinion is not necessarily required.'" (citation omitted) (quoting

*Tankisi*, 521 F. App'x at 34)).  "[A]n ALJ cannot 'assess a claimant's RFC on the basis of bare

medical findings, and as a result an ALJ's determination of RFC without a medical advisor's

assessment is not supported by substantial evidence.'"  *Stubbs v. Comm'r of Soc. Sec. Admin.*,

No. 17-CV-6607, 2018 WL 6257431, at *6 (W.D.N.Y. Nov. 30, 2018) (quoting *Cutre v.

Berryhill*, No. 17-CV-135, 2018 WL 3968385, at *3 (W.D.N.Y. Aug. 20, 2018)); *Penny Ann W.*,

2018 WL 6674291, at *4 ("[T]he record must have more than mere medical findings: [A]n ALJ

is not qualified to assess a claimant's RFC on the basis of bare medical findings . . . ." (second

alteration in original) (quoting *Barnes v. Berryhill*, No. 16-CV-1013, 2018 WL 1225542, at *4

(D. Conn. Mar. 9, 2018)).  Therefore, "[w]here the medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate these diagnoses to specific residual functional capacities such as those set out in 20 C.F.R. § 404.1567(a) . . . [the Commissoner may not] make the connection himself."  *Penny Ann W.*, 2018 WL 6674291, at *4 (alterations in original) (quoting *Walker v. Astrue*, No. 08-CV-828, 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010), *report and recommendation adopted*, 2010 WL 2629821 (W.D.N.Y. June 28, 2010)).  "As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations . . . , to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing."  *Id.* at *6 (quoting *Gross v. Astrue*, No. 12-CV-6207, 2014 WL 1806779, at *19 (W.D.N.Y. May 7, 2014)) (citing *Lawton v. Astrue*, No. 08-CV-137, 2009 WL 2867905, at *16 (N.D.N.Y. Sept. 2, 2009)).

"Light work involves lifting no more than [twenty] pounds at a time with frequent lifting or carrying of objects weighing up to [ten pounds]," and it either requires "a good deal of walking or standing, or . . . involves sitting most of the time with some pushing and pulling."  20 C.F.R. § 416.967(b).  "Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately [six] hours of an [eight]-hour workday."  SSR 83-10.

Substantial evidence does not support the ALJ's finding that Plaintiff has the RFC to perform the "full range of light work."  (R. 29.)  As discussed above, Dr. Nazar opined that Plaintiff could lift or carry up to ten pounds occasionally, stand and/or walk for less than two hours per workday, and sit for one to two hours in a workday with frequent position changes.  (R. 350–51.)  Dr. Shtock opined that Plaintiff has moderate limitation with heavy lifting and

walking long distances and mild to moderate limitation with standing and sitting for long periods.  (R. 364.)

In finding that Plaintiff has the RFC to perform the full range of light work, the ALJ discounted Plaintiff's subjective complaints of a limited capacity for lifting and carrying and for walking based on the examination findings made by Dr. Vaillancourt and the nurse practitioners at South Shore that Plaintiff has "normal upper extremity strength and sensation as well as normal fine motor skills" and that her "balance and gait [were] intact."  (R. 31.)  However, these are bare medical findings.  None of these medical sources assessed Plaintiff's functional capacity or limitations based on their findings, and the record does not contain any other medical opinion evidence from acceptable medical sources with respect to Plaintiff's functional capacity or limitations.  Under these circumstances, the ALJ had a duty to develop the record and to obtain RFC assessments from Plaintiff's treating and/or examining physicians.  *See Aceto v. Comm'r of Soc. Sec.*, No. 08-CV-169, 2012 WL 5876640, at *16 (N.D.N.Y. Nov. 20, 2012) ("[Because] the ALJ had nothing more than treatment records and consultative reports to review, he had an affirmative duty to develop the record and request that Plaintiff's treating physicians assess her RFC."); *Lawton*, 2009 WL 2867905, at *16 ("[T]he record . . . contains no assessment from a treating source quantifying [the] plaintiff's physical capabilities, and thus there is no basis upon which the court can find that substantial evidence supports the ALJ's light work RFC determination."); *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003) ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability.").

Instead of developing the record, the ALJ concluded based on the examination findings of normal extremity strength and gait that there was no basis to conclude that Plaintiff cannot lift

and carry up to twenty pounds occasionally and up to ten pounds frequently.  (R. 31.)  However, the ALJ is not permitted to substitute his own lay opinion of the medical evidence for the medical opinion of an acceptable medical source.  *See, e.g.*, *Perez*, 2019 WL 1324949, at *6 ("Without a supporting medical opinion of [the plaintiff's] functional limitations, the ALJ's RFC determination that [the plaintiff] was capable of sedentary work 'constituted an impermissible interpretation of bare medical findings' and is not supported by substantial evidence." (quoting *Guarino v. Colvin*, 14-CV-598, 2016 WL 690818, at *2 (W.D.N.Y. Feb. 22, 2016))); *Felder v. Astrue*, No. 10-CV-5747, 2012 WL 3993594, at *13 (E.D.N.Y Sept. 11, 2012) ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of a supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." (quoting *Hilsdorf*, 724 F. Supp. 2d at 347–48)); *Jermyn v. Colvin*, No. 13-CV-5093, 2015 WL 1298997, at *19 (E.D.N.Y. Mar. 23, 2015) ("[T]he ALJ's RFC determination is wholly unsupported by any medical evidence as the record is devoid of any opinions from treating or examining medical sources regarding [the plaintiff's] functional or work capacity limitations, such as [the plaintiff's] lifting, carrying, sitting or standing limits.  Under these circumstances, the ALJ was obligated to develop the record and obtain RFC assessments from [the plaintiff's] treating and/or examining physicians."); *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) ("An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities.")

Indeed, the only evidence in the record as to Plaintiff's functional limitations based on her physical impairments — the opinions of Dr. Nazar and Dr. Schtock — either contradicts the ALJ's RFC determination or cannot, as a matter of law, be relied upon heavily by the ALJ in

making his determination.[13]  By failing to support the RFC determination with proper medical

evidence, the ALJ committed legal error, warranting remand.  *See, e.g.*, *Santangelo*, 2019 WL

4409339, at *10 (finding RFC determination unsupported by substantial evidence and remanding

where "[t]he only discussion of [the plaintiff's] ability to lift, stand, and walk is from her hearing

testimony" and "[i]t appear[ed] that the ALJ interpreted the raw medical evidence to arrive at the

conclusion that [the plaintiff] was physically capable of light work"); *Penny Ann W.*, 2018 WL

6674291, at *6 (remanding "because the record is underdeveloped regarding the functional

implications of [the plaintiff's] weakness in her lower extremities" and "in failing to obtain a

medical opinion as to [the plaintiff's] RFC, the ALJ failed to fully develop the record"); *House v.

Astrue*, No. 11-CV-915, 2013 WL 422058, at *4 (N.D.N.Y. Feb. 1, 2013) (finding RFC

determination unsupported by substantial evidence and remanding "[b]ecause there is no medical

source opinion supporting the ALJ's finding that [the plaintiff] can perform sedentary work");

*Hilsdorf*, 724 F. Supp. 2d at 348 (finding RFC determination unsupported by substantial

evidence and remanding where there were no opinions from the plaintiff's treating physician and

no RFC assessment from "any proper source"); *see also see Ostrom v. Comm'r of Soc. Sec.*, No.

14-CV-268, 2015 WL 1735097, at *12–14 (N.D.N.Y. Apr. 16, 2015) (finding error where the

ALJ rejected the "only competent [RFC] medical opinions of record" and instead "substituted

her own judgment" of the medical findings as support for the RFC); *Downes v. Colvin*,

---

[13]  As the Commissioner argues, chiropractors "are not acceptable medical sources" because chiropractors were not listed as such in the regulations that were in effect when the ALJ rendered his decision in 2016.  (Comm'r Mem. 20.)  However, while the 2016 regulations do not list chiropractors as an "acceptable medical source," 20 C.F.R. § 416.913(a) (2016), they do state that "[i]n addition to evidence from the acceptable medical sources listed . . . , we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work," including evidence from "chiropractors," *id.* § 416.913(d)(1); *Diaz v. Shalala*, 59 F.3d 307 (2d Cir. 1995) ("There are five categories of acceptable medical sources that can render medical opinions and a chiropractor's opinion is not a medical opinion.").

No. 14-CV-7147, 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015) (noting that "the treatment notes and test results from [the plaintiff's] treating physicians do not assess how [the plaintiff's] symptoms limited his functional capacities" and remanding for further findings).

Finally, this is not a case where evidence shows relatively little physical impairment, such that the ALJ could permissibly render a commonsense judgment about functional capacity. As Plaintiff argues, her treating sources consistently documented significantly reduced cervical and lumbar spine ROM, (*see* R. 254, 441, 446, 455, 463, 482–83, 487–88, 493, 499), as well as positive Patrick's tests for sacroiliac joint disease, (*see* R. 253 (McIntyre), 455 (Vaillaincourt), 483 (Grant), 488 (Chatterton)).  Nor is this a case where the record contains sufficient evidence that the ALJ could determine Plaintiff's functional limitations on his own.  In determining Plaintiff's RFC, the ALJ reasoned that Plaintiff "has described daily activities which are not limited to the extent one would expect given the complaints of disabling symptoms and limitations."  (R. 31.)  Plaintiff "testified that she took a photography course" and "told her treating physicians that the course was physically demanding" and involved "carrying heavy equipment," yet she "declined to take more courses for reasons other than her medical conditions."  (R. 31.)  In addition, she testified that "she 'works' every day cleaning her home, taking care of herself, and going to doctor appointments," and that she "dusts, vacuums, does laundry, cleans her refrigerator, takes out garbage, and cares for a dog."  (R. 31.)  However, the record does not support the ALJ's characterization of Plaintiff's statements, or his reasoning. First, while Plaintiff told her treating physicians that her photography course was physically demanding, (*see* R. 438, 449 (Chatterton's notes stating Plaintiff's photography course "challenges her physically and increases her pain but it is important to her"); R. 439 (Grant's notes stating Plaintiff is "attending a photography course which she loves and is causing her

severe pain")), the Court is unable to locate any statement by Plaintiff that she was "carrying heavy equipment" in connection with her class, or any other statement tending to suggest a capacity to lift and carry twenty pounds occasionally and ten pounds frequently.  Rather, the record reflects that the amount of walking involved in taking an on-campus course challenged Plaintiff and increased her pain.  (R. 458 (Chatterton's notes instructing Plaintiff to begin ten- to thirty-minute walks with her camera "in preparation for activities that would demand longer days").)  Second, Plaintiff did not testify that she works every day cleaning her home but rather that taking care of herself and her house and going to the doctor is work, that she is not able to do household chores on a daily basis, and that when she *does* do a full day's worth of chores it takes her several days to recover.  (R. 43–44, 52.)  This testimony is consistent with Plaintiff's reports to her physical therapist, Chatterton.  (R. 459 (reporting that Plaintiff felt "shot" that day because she had "lifted a bag of clothes into a bin and is paying for it"); R. 476 (reporting that Plaintiff got overzealous following PT, "lifted up a case of water[,] and felt immediate pain from the low back to the neck")).  Plaintiff's efforts to pursue the things that are important to her and to engage in self-care do not establish that she is not disabled.  *See Balsamo*, 142 F.3d at 81–82 ("'[W]hen a disabled person gamely chooses to endure pain in order to pursue important goals,' such as attending church and helping his wife on occasion go shopping for their family, 'it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working.'" (quoting *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989))); *Woodford*, 93 F. Supp. 2d at 529 (explaining that "'[s]uch activities do not by themselves contradict allegations of disability,' as people should not be penalized for enduring the pain of their disability in order to care for themselves" (quoting *Boyd v. Apfel*, No. 97-CV-7273, 1999 WL 1129055, at *3 (E.D.N.Y. Oct. 15, 1999))).

Because the ALJ should have sought medical opinions about Plaintiff's RFC rather than substituting his own opinion based on examination findings, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion for judgment on the pleadings. *Mantovani v. Astrue*, No. 09-CV-3957, 2011 WL 1304148, at *4 (E.D.N.Y. Mar 31, 2011).[14]

## III. Conclusion

For the foregoing reasons, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion for judgment on the pleadings. The Commissioner's decision is vacated and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). On remand, the ALJ is directed to develop the record as it relates to Plaintiff's physical impairment by obtaining RFC assessments from medical sources, including Plaintiff's treating physicians. The Clerk of Court is directed to close this case.

Dated: March 31, 2021
       Brooklyn, New York

SO ORDERED:

    s/ MKB
MARGO K. BRODIE
United States District Judge

---

[14] The Court cannot address the parties' arguments regarding whether the ALJ's analysis at step five was based on substantial evidence in the record because the ALJ did not properly assess Plaintiff's RFC, which is necessarily intertwined with the analysis of jobs available to Plaintiff. *See Mantovani v. Astrue*, No. 09-CV-3957, 2011 WL 1304148, at *5 (E.D.N.Y. Mar. 31, 2011) (declining to address arguments regarding the ALJ's step five determination when remanding for failure to properly develop the record and assess the plaintiff's RFC).